COURT OF APPEALS

                                         SECOND
DISTRICT OF TEXAS

                                                      FORT
WORTH

 

 

                                           NO.
2-08-059-CV

 

 

IN THE
INTEREST OF

A.S., T.S., AND C.S.,

CHILDREN

                                                                                                           

 

                                                  ------------

 

             FROM THE 323RD
DISTRICT COURT OF TARRANT COUNTY

 

                                                  ------------

 

                                  MEMORANDUM OPINION[1]

 

                                                  ------------

After a bench trial, the trial court terminated
Appellant J.S.=s parental rights to his
daughters A.S., T.S., and C.S.  In one
issue, he contends that the evidence is factually insufficient to support the
trial court=s finding that the termination
of his parental rights is in the children=s best
interest.  Because the evidence is
factually sufficient to support the finding, we affirm the trial court=s order
of termination.








Appellant also raised the issue of the factual
sufficiency of the evidence to support the best interest finding in his timely
filed combined statement of points and motion for new trial.  We decline the State=s
request to reconsider our rulings in In re D.W.[2]
and In re A.J.H.[3]
and hold that this issue was sufficiently preserved.

Termination decisions must be supported by clear
and convincing evidence.[4]  Evidence is clear and convincing if it Awill
produce in the mind of the trier of fact a firm belief or conviction as to the
truth of the allegations sought to be established.@[5]  Due process demands this heightened standard
because termination results in permanent, irrevocable changes for the parent
and child.[6]








In reviewing the evidence for factual
sufficiency, we must give due deference to the factfinder=s findings
and not supplant the judgment with our own.[7]  We must determine whether, on the entire
record, a factfinder could reasonably form a firm conviction or belief that the
termination of the parent-child relationship would be in the best interest of
the child.[8]  If, in light of the entire record, the
disputed evidence that a reasonable factfinder could not have credited in favor
of the finding is so significant that a factfinder could not reasonably have
formed a firm belief or conviction in the truth of its finding, then the
evidence is factually insufficient.[9]


There is a strong presumption that keeping a
child with a parent is in the child=s best
interest.[10]
 Prompt and permanent placement of
the child in a safe environment is also presumed to be in the child=s best
interest.[11]  The following factors should be considered in
evaluating the parent=s willingness and ability to
provide the child with a safe environment:

(1) the child=s age and physical and
mental vulnerabilities;

 

(2) the frequency and nature of out‑of‑home placements;

 








(3) the magnitude, frequency, and circumstances of the harm to the
child;

 

(4) whether the child has been the victim of repeated harm after the
initial report and intervention by the department or other agency;

 

(5) whether the child is fearful of living in or returning to the
child=s home;

 

(6) the results of psychiatric, psychological, or developmental
evaluations of the child, the child=s parents, other family members, or others who
have access to the child=s home;

 

(7) whether there is a history of abusive or assaultive conduct by the
child=s family or others who
have access to the child=s home;

 

(8) whether there is a history of substance abuse by the child=s family or others who
have access to the child=s home;

 

(9) whether the perpetrator of the harm to the child is identified;

 

(10) the willingness and ability of the child=s family to seek out,
accept, and complete counseling services and to cooperate with and facilitate
an appropriate agency=s close supervision;

 

(11) the willingness and ability of the child=s family to effect
positive environmental and personal changes within a reasonable period of time;

 

(12) whether the child=s family demonstrates adequate parenting skills,
including providing the child and other children under the family=s care with:

 

(A) minimally adequate health and nutritional care;

 








(B) care, nurturance, and appropriate discipline consistent with the
child=s physical and
psychological development;

 

(C) guidance and supervision consistent with the child=s safety;

 

(D) a safe physical home
environment;

 

(E) protection from repeated exposure to violence even though the
violence may not be directed at the child; 
and

 

(F) an understanding of the child=s needs and capabilities; and

 

(13) whether an adequate social support system consisting of an
extended family and friends is available to the child.[12]

 

Other, nonexclusive factors that the trier of
fact in a termination case may use in determining the best interest of the
child include:

(A)    the
desires of the child;

 

(B)     the
emotional and physical needs of the child now and in the future;

 

(C)    the
emotional and physical danger to the child now and in the future;

 

(D)    the
parental abilities of the individuals seeking custody; 

 

(E)     the
programs available to assist these individuals to promote the best interest of
the child;

 








(F)     the
plans for the child by these individuals or by the agency seeking custody;

 

(G)    the
stability of the home or proposed placement;

 

(H)    the
acts or omissions of the parent which may indicate that the existing parent‑child
relationship is not a proper one; and

 

(I)      any excuse for the acts or omissions of
the parent.[13]

These factors are not exhaustive; some listed
factors may be inapplicable to some cases; other factors not on the list may
also be considered when appropriate.[14]  Furthermore, undisputed evidence of just one
factor may be sufficient in a particular case to support a finding that
termination is in the best interest of the child.[15]  On the other hand, the presence of scant
evidence relevant to each factor will not support such a finding.[16]









The evidence shows that A.S., T.S., and C.S. were
five, four, and three years of age respectively at the time of trial in late
2007 and early 2008.  They first entered
the State=s care via Dallas County CPS in
June 2005 after allegations that their mother neglected and abused them.  (Their mother=s rights
were also terminated; she did not appeal.) 
Appellant was homeless and a drug addict at the time of the first
removal.  While the State offered him
services, he did not participate in any; he did test positive for cocaine.  He visited the children no more than five
times during the first eighteen months that the children were in the State=s care.

In June 2006, the State placed the children with
Appellant=s brother, B.S., who was later
awarded permanent managing conservatorship in December 2006.  Appellant saw the girls occasionally when
they were with his brother but did not provide contact information to the State
and never attempted to contact the State during that time.

In January 2007, B.S. took the children to the
Fort Worth CPS office and relinquished custody. 
The State could not locate Appellant at that point but filed a petition
for termination of parental rights later that month and served him with the
petition on February 1, 2007.  Sh=niqua
Alford, a CPS caseworker, met with Appellant, who was still homeless.  She told him that B.S. had returned the
children to CPS and that they were going to remain in foster care; she also
told him about the family service plan. 
Appellant stated that he wanted to participate in services but wanted
his children to live with B.S.  Alford
gave Appellant all of her contact information; Appellant provided none.  He did not contact Alford again until several
months later.








On August 31, 2007, Appellant left a message with
Alford, stating that he wanted the children back.  He went to her office, and they again
discussed the family plan.  Alford
advised him that he should start the services immediately and take a drug
test.  He tested positive for cocaine.  Appellant denied using drugs at that
time.  Appellant visited his children in
September 2007.  That was the last
contact he had with his children.  

On the last day of trial, Appellant reported that
he had not used drugs in the previous three months, he had a job at Burger
King, and he had an apartment.  But he
had not pursued completing a GED or attending AA or NA meetings after hitting
minor stumbling blocks, he had not pursued any other type of drug treatment, and
the program paying the rent and electricity on his one-bedroom apartment,
Project New Start, would not make payments after thirty days= notice
if he got physical custody of his children.

While Appellant testified that his children were
happy to see him during the one visit he made between January 2007 and the
trial that ended a year later, their foster mother, with whom they had lived
several months, testified that the children did not talk about him and cried
when confronted with the possibility of having to live with himCC.S.
regressed and began to wet herself at different times, T.S. was tearful and
scared, and A.S. Afed off everybody else.@








All of the children had made outcries of sexual
abuse against B.S., which were still under investigation, by the time of the
last day of trial in January 2008, and there was evidence that all three girls
would need therapy to address that issue. 
Further, there was evidence that all three girls have trust issues
relating to men.

Additionally, A.S. has speech problems and a
cognitive deficiency.  She needs extra
help in school and will continue to need help. 
She has trouble processing language and trouble with math.  She may need speech therapy and occupational
therapy.  Even though she was in
kindergarten at the time of trial, she functioned at the level of a
two-year-old.  She was also getting
neurological and genetic testing to try to determine what was preventing her
from developing age-appropriately.

When A.S. first began to live with the foster
mother about ten months before the final day of trial, she was quiet and shy, but
at the time of trial she was excited about school, had friends, and had begun
opening up.

T.S., the middle child, mothers her two
sisters.  She is on track developmentally
but has some attachment and bonding issues. 
When she first began living with the foster mother, she had nightmares
and was afraid to go back to sleep.  At
the time of trial, she was thriving.








C.S., the youngest child, has some speech
issues.  She used foul language when she
first arrived at the foster mother=s house,
but at the time of trial she used foul language less and would correct herself
when she did use it.

The children=s
therapist testified that the girls need to be placed in a stable environment.  She testified that if they were placed in an
unstable or unstructured environment, they would be Ahighly
dysfunctional, probably not being able to perform well in school; . . . and [it
would be] very difficult for them to progress in school as other children do.@

There was evidence that the children
had bonded with the foster family, that the children were happy and well cared
for in a stable home, and that they got a lot of attention and support from
their foster family.  The evidence also
showed that the foster parents wanted to adopt the children and that such
adoption was the State=s plan.  Further, the foster
parents were willing to maintain the children=s contact with other siblings.

There was little evidence of
Appellant=s parental ability.  He
admitted that he had not nurtured or fed the children since 2005 and that he
did not meet his own characteristics of a good fatherCA[b]eing there, caring for them, feeding, bathing, nurture.@  During the six-week delay
between the first and second days of trial, Appellant still did not visit the
children or take a drug test.








Applying the appropriate standard of
review and considering the Holley factors and the statutory factors for
evaluating Appellant=s willingness and ability to provide his children with a safe
environment,[17] we
hold that the evidence is factually sufficient to support the trial court=s finding that termination of Appellant=s parental rights is in the children=s best interests.  We
therefore overrule his sole issue and affirm the trial court=s order of termination.

PER CURIAM

PANEL:  DAUPHINOT,
WALKER, and MCCOY, JJ.

DELIVERED: November 6, 2008

 











[1]See Tex. R. App. P. 47.4.





[2]249 S.W.3d 625, 645 (Tex.
App.CFort Worth 2008, pet.
denied) (en banc).





[3]205 S.W.3d 79, 80B81 (Tex. App.CFort Worth 2006, no
pet.).





[4]Tex. Fam. Code Ann. '' 161.001, 161.206(a)
(Vernon Supp. 2008).  





[5]Id. ' 101.007 (Vernon 2002). 





[6]In re J.F.C., 96 S.W.3d 256, 263
(Tex. 2002); see In re J.A.J., 243 S.W.3d 611, 616 (Tex. 2007)
(contrasting standards for termination and modification). 





[7]In re H.R.M., 209 S.W.3d 105, 108
(Tex. 2006).





[8]In re C.H., 89 S.W.3d 17, 28 (Tex.
2002).





[9]H.R.M., 209 S.W.3d at 108.





[10]In re R.R., 209 S.W.3d 112, 116
(Tex. 2006).





[11]Tex. Fam. Code Ann. ' 263.307(a) (Vernon
2002).





[12]Id. ' 263.307(b); R.R.,
209 S.W.3d at 116.





[13]Holley v. Adams, 544 S.W.2d 367, 371B72 (Tex. 1976). 





[14]C.H., 89 S.W.3d at 27.  





[15]Id.  





[16]Id.





[17]See Tex. Fam. Code Ann. ' 263.307(b);
Holley, 544 S.W.2d at 371B72.